at all? Counsel can come forward. Good morning, Your Honors. Have you folks agreed on a division of time on the defense side? We have. Yes, Your Honor. What are you going to do? What we propose is I, Mary McNamara, will take 6 minutes. My co-counsel, Patience Milrod, will take 6 minutes. And our colleague, Paul Pauly, will take 2 minutes, and we'd like to reserve 1 minute. But you want 6? Please. Put 6 on the clock, please. Thank you. Just a second. This may tax our machinery. Okay. All right. We understand. You two can sit at the table if you want. You don't have to ---- Okay.  6 minutes, you're on. Thank you, Your Honor. I'm going to address the question of the interpretation of the statute and the Court's instruction of the statute. Ms. Milrod will address the David Verdi informant arguments. Your Honors, the key question in this appeal as concerns the statute is whether or not it is permissible to send somebody to prison for up to 20 years on the basis of a showing of mere negligence. That's what happened in this case. My client, Daniel Rosen, actually got a 15-year sentence. Ms. Milrod's client got a 97-month sentence on the basis of a misinstruction to the jury that it was permissible for them to return a verdict of guilt if they found, through mere negligence, that these defendants had simply distributed chemicals and ---- Is that what the judge said? You may return a finding of guilt if you find mere negligence. Is that what the judge told the jury? That is not what the judge said. The judge gave the instruction ---- And your client did not want the judge to define the reasonableness branch, correct? Well, no, Your Honor. My client's lawyer asked the court to give an instruction that omitted reasonable calls to blame. Exactly. But if it was going to be given in accordance with the statute, your client's lawyer did not want it defined, correct? Only when the court disallowed that argument. Only when the court said no. Yes. I said that. If it was going to be given, your client's lawyer did not want it defined, correct? Correct. So what you're saying you're doing is basically you're attacking the statute on its face, in effect. Well ---- You're saying the statute cannot make that one of the standards, correct? I'm making two arguments. I'm making that argument, but I'm also saying that on this record where the court allowed a debate between counsel as to what the legal elements of the statute were, I'm attacking the way the court failed to instruct or to clarify what the elements were. The debate that your client wanted to engage in, correct? Yes. But only if, only when, Your Honor, the court had disagreed with what I'm submitting the law should be, and that is that this statute requires actual knowledge or something akin to it, and that is bad faith. This Court ruled that the ---- in its pretrial order, firming up jury instructions, that this statute requires only mere negligence. It failed to define what is, I think, ambiguous language, reasonable cause to believe, and then allowed the jury to hear two competing versions of what reasonable cause to believe is. Wasn't your client repeatedly warned about this? No. In terms of the evidence from the DEA? Yeah. The evidence suggests that he got interviewed by DEA agents and was told that precursor chemicals may be used to manufacture methamphetamine. That's true. He was told that ordinary business people in his circumstance might ship a case or two of this material to an end user. That's correct. And he was sending, what, 10,000 cases? He was sending a large number of cases. That's correct. There is no case ---- People who were paying him with cashier's checks made out in less than $10,000.  There is no case that says those two facts on their own establish actual knowledge. They may be sufficient to establish a negligent state of mind or that he should have exercised due care and have violated a due care standard. In fact, that was his defense, as it was the defense of all the other defendants. Everybody conceded here that these defendants acted stupidly or negligently. The question is, did they subjectively act with bad faith? And the answer to that, Your Honors, is I think not. Or at least we don't have enough evidence, and Ms. Milrod will address this point, because David Verdi, who was the key informant in this case and for whom the government now ascribes 10 of his 26 pages of facts, we didn't hear enough about David Verdi to be able to impeach him. You know, what you're raising is in some sense a deeply philosophical problem. The same thing comes out in deliberate ignorance. Personally, I agree with you. There's no such thing. You either know or you don't know. But that ain't the way the law seems to read. The law seems to allow you to say actual knowledge or reason to believe. And, for example, if I turn a light switch, I don't have actual knowledge. I'm not going to set off a bomb as opposed to turning on lights. But I certainly have reason to believe that I will turn on lights when I do that. And everything, almost everything we do in our lives is that way. There are very few things we have actual knowledge of, almost nothing, if actual means some philosophical actual. It seems to me that's what this statute's talking about. I disagree. I think that it is perfectly permissible, and Congress has legislated negligent standards or something less than actual knowledge in public welfare statutes. I point out that the cases that the government cites at page 61 of its brief are all cases which involve misdemeanor offenses which carry significantly reduced penalties. Clean Water Act, one year. Lacey Act, one year. Montana Hedge Shop cases, six months. This is a case that carries a 20-year penalty, where my client got 15 years on the basis of something far less than actual knowledge, something that the hypothetical reasonable man might suppose from surrounding circumstances. No court has held that that's sufficient. In fact, the only court to have addressed this issue, Your Honors, the Saffo Court, held clearly that to be constitutionally effective or sufficient, actual knowledge or bad faith is required. There is no court that has held anything less than that. And even in the public welfare realm, the States less than actual knowledge have, again, very reduced penalties. So we might not always know actually that something has been done, but the law requires us to have a bad faith or culpable mind, and that's not what this Court required here. The other point to understand about this statute is this is a precursor chemical statute. It is not per se a culpable act to distribute precursor chemicals as it is to dump chemicals into the water at night, as it is to distribute illegal drugs. This is something which is legal. The only thing that makes it illegal or criminal is one's state of mind. And in this case, where there was a debate allowed in front of the jury about what the law was as to what the jury had to find, I submitted to Your Honors that this Court has to reverse on the basis of a misinstruction to the jury or a constructive amendment of the indictment. Roberts. You're over your six minutes. I will stop, Your Honor.  Before you get up, counsel, would you like to respond? No, no, no. I wanted to offer you the opportunity to do that, because this is nicely segmented, but if you'd prefer to respond all at once, that's fine also. Counsel? Good morning. May it please the Court, my name is Patience Milrod. I'll be addressing the issues relating to the evidence that was withheld and tardily produced with respect to David Verdi. I'll be speaking for all defendants on that issue. The government has admitted in its brief that this evidence was exculpatory in nature. It included examples of Verdi lying to other people in exactly the same way as he lied to these defendants. The government implicitly admits that Verdi was central to its case by devoting 10 of its 26 pages of its statement of facts exclusively to Mr. Verdi's testimony. And the Mr. Verdi's testimony was central to the government's case in another way, in that it was the only evidence that allowed the jury to draw inferences about the mental state of the defendants. That is, as my co-counsel has said, the prerequisite for a conviction here. In addition, Mr. Verdi's testimony with respect to mental state was not otherwise corroborated. So he was absolutely pivotal. He was the linchpin. There's a kind of a slippery slope problem with this. Isn't there the worse Verdi appears, the worse the defendants appear for having dealt with him? Well, actually, Your Honor, as Ms. McNamara mentioned, these defendants all admitted that they were at best negligent and at worst stupid. And there is one of the pieces was whether he made a million dollars a year from this stuff or 10, right? Well, actually, I beg to differ with the Court. The evidence about Verdi, if the jury had heard it, would have helped the jury understand that our clients, the operation with our clients was a little tiny sliver of his general activity, and that was critical information for the jurors to have. They could not adequately assess who are these people, what is the context within which we are learning information about them, how do we weigh their evidence if they did not know about the full range of Verdi's activities. Judge Burrell has already concluded that the government was both negligent and untimely in failing to produce this evidence. And as this Court is aware, our contention is that those failures and the trial court's failure adequately to do its job in various ways impeded cross-examination, but also and more importantly, deprived these defendants of critical corroboration of their only defense, which was that Verdi had lied to them, had duped them, and they went along with him, but that they themselves did not have that criminal mind that is required for conviction. Verdi, if the full Verdi evidence had been before the jury, the jury would have learned that his money laundering activities extended to Cuba, Mexico, Syria, Jordan, Costa Rica, Germany, Belgium, Romania, and the Czech Republic. They would have learned that his trafficking activities in the United States involved activities in California, Arizona, Nevada, Texas, Louisiana, New Jersey, and New York, and in addition involved activities in Mexico. They would have learned that he was powerful enough to have context inside the DEA. They would have learned that he made millions of dollars, not related to this conspiracy, but related to these other activities, and that he was sending weapons to Syria. And they would have had a chance to juxtapose this fully fleshed portrait of Mr. Verdi, which they didn't ever see, against what they learned about the Rosens and the Mansours, which is that they were they ran small local businesses, they were not particularly sophisticated, and they weren't particularly intelligent. So the government's position that Mr. Rosen and Mr. Mansour were directing Mr. Verdi what to do, and that they were, these defendants were partners, at least the Mansours were partners with Mr. Verdi, that contention simply could not have passed the straight-face test with this jury if the jury had had all of the information they should have had. In addition, the jury did not hear about Verdi's lies to other people, telling Ray, for example, that pseudoephedrine is really cough syrup, telling Simon that actually this isn't illegal, yeah, you know, sometimes they use it to make drugs, but this is really lawful activity. They didn't learn about Verdi's perjury in this proceeding. They didn't learn about Verdi's perjury in this proceeding, cynically asserting to the jury that he doesn't really know anything about methamphetamine, he doesn't know what it is, whereas in debriefing with Federal agents, he was telling them, gee, you know, I know that this is how you make it and this is what you do with it, and actually is quite familiar with it. In Carragher v. Stewart, the Court held the disclosure obligation exists, after all, not to police the good faith of prosecutors, but to ensure the accuracy and fairness of trials by requiring the adversarial testing of all available evidence bearing on guilt or innocence. And so the prosecution, who's in a position to get all this information, really doesn't have the option to come to court on the 4th and the 11th and the 20th day well after the defense has been prepared and the cross-examination has been conducted. The V-key witness would say, gosh, I've got some additional stuff, and Judge Burrell, would you look at this 127 pages in the next 20-minute recess and make a ruling about whether or not to withhold it? The ---- When there are about 200 and some pages across the Verde in which, at least when I read through the cross-examination that you were able to do, it looked to me like he was a scumbag and an untruthful person, et cetera, et cetera. And at the end of the day, that's what the jury was told about him. And I believe we have cases that say, you know, yeah, maybe some stuff didn't come in that should have, but when you've really demonstrated this person is a terrible scumbag, that's what the jury needs to know. That's part of what the jury needs to know. In this case, they didn't learn the whole range of his scumbag nature, but they ---- But much more importantly, they didn't learn about the sophisticated extent of his massive operations. And it was critical they know that. I guess I'm not going to interrupt, but I'm kind of troubled by the same thing that Judge Hawkins asked you about, which is the ---- it seems to me that the more massive and powerful Verdes appears, then the worse your clients appear in the sense of saying, how could anyone be fooled by this, you know, multimillion-dollar contact person who's saying, oh, no, we're just doing cough syrup? Well, isn't the Court assuming that the ---- I'm not assuming. I'm just saying, in terms of assessing what ---- I'm just saying, in terms of assessing what the factual underpinnings of that would    And so I think that's the question. It's my understanding that the Court is assuming that there would be evidence that our clients knew about the extensive nature of these operations, and that was part of the point. It's ---- No, I think the question is, if you show how large an operation this guy has, the obvious to anyone dealing with this person that, you know, I mean, I'm just saying that's the question of materiality that we have to look at. Well, I guess I'm missing the ---- what the factual underpinnings of that would be, because there would have to be some knowledge. There would have to be information to these defendants that there was stuff going on in other countries and with other people in other States. And that information ---- Well, how does it help you? There's no reason to assume, there's no evidence from which to infer that our clients had that information. And no reason to believe that Verdi wasn't doing the same kind of using of dupes in other locations. In other words, Verdi was the hub. And then he had various satellite individuals who were ---- Our questions have taken you over your time. Thank you very much, counsel, for your effective argument. Mr. Hawley? I've lost track of how much time. You had. They generously gave me two minutes. Okay. Put two on the clock. And the only reason that I'm here to ---- I was a trial lawyer in the case. And I was the one who was screaming every time. Just a second. Two. 2.00. I should start over. My name is Robert Hawley, and I represent Mr. Mansour. I'm in Mansour. I was a trial lawyer in the case, and I was the one who was screaming with some of my co-counsel every time that we learned that there was more information on David Verdi that we didn't have. When it happened, when there was a whole ---- when there were reams of material that went back into chambers and never came out again, I knew there was something there. You know that. I've been a trial lawyer for 30 years, and I can tell you that we would have made mincemeat out of Verdi had I had that material. This is not a case where Verdi is going to look more sophisticated, except for his sophistication is that he duped people. And we found that out on appeal. That was the first time I got to see 160 pages. And had I had that material, we could have shown the jury that David Verdi was not only a con man and a good one, but that some of the people that he conned, he told exactly the same information to as he told to Eymann and Helmy Mansour, that he was sending cough medicine overseas. That was part of it. But if you look at beginning on page 90 of the brief, you'll see all of those items that were redacted, and David Verdi at one point, he says that his operation was over $100 million. And I can tell you that had we known all of this information, I could have cross-examined Verdi in a whole different way. And we knew it at the time. I was screaming for it. The judge didn't have any idea what we would have used it. Just like I listened to your Honor's questions, and you don't know how we could have used that material. But I can tell you that as a trial lawyer in that case, and we worked very, very hard on it, we could have used that material in such a way that would have shown that David Verdi was, in fact, a sophisticated con man, and that he was probably a terrorist, and that he was using Eymann and Helmy Mansour, who were very unsophisticated businessmen, using them in a way that was concomitant right with our defense. And we may have won the case. We don't know. Nobody can tell what the jury would have done with it. But the fact is, we should have had it. We didn't have it. And in my opinion, we very well could have won the case had we had that information. I don't know. He was crucial to the defense of all of those people. And our clients did not get a fair trial because they hid all that information from us. We're a little over your time. Thank you for your argument. We'll hear from the government at this time. Spangler. May it please the Court. I'm Samantha Spangler, Assistant United States Attorney. As to David Verdi, the Court must remember that its standard of review here is clear error review because the government followed. What prevented the government from disclosing all of this information before the trial  I'm sorry? The first part of the question. What prevented the government from disclosing all of the information about Verdi in advance of trial? Well, in advance of trial, we weren't required to disclose it because it was Jenks material. And whenever Jenks and Brady are intertwined, Jenks trumps Brady, as this Court has held. What prevented us from giving it to them in a more timely fashion was typical problems with the government not getting the documents as quickly as we should have gotten them. And I take responsibility for that here, as I did in the lower court. And I apologize for it. But they had what information they got in a timely enough manner that they were entitled and had the opportunity to cross-examine Verdi to their heart's content. And, in fact, they did. How many pages of documents were submitted to Judge Burrell relating to possible impeachment of Verdi after the trial started? I don't have that number, Your Honor. Is it in excess of 100? Yes. Is it in excess of 200? It could be. Is it in excess of 1,000? No. Somewhere between 200 and 1,000? Absolutely not. Somewhere between there. And all of these were documents that were prepared. If there's a date on them, the date would be in advance of trial? Yes. And Judge Burrell is a very hardworking judge, as Your Honors may have discovered from reviewing others of his cases. He spends a considerable amount of time, other than in-court time, to work on his cases. And he did that here. He told us in the record that he spent substantial amounts of time. In addition to the written documents he was given, he was also given tape recordings, and he listened to those tape recordings. And remember, Judge Burrell reviewed this material after most of Verdi's testimony. And, in fact, that's an advantage to the trial judge, because then he's not ruling in a vacuum. He knows how well the witness has already been examined. Well, it may be an advantage to the trial judge, but it's hardly an advantage to the defense counsel. Well, that may be true, but you say you gave them enough time, but, you know, carefully done cross-examination does take a very long time to prepare if you have good documents, because you have to think about different strategies. And you deprive the defense counsel of that opportunity. Well, Your Honor, we didn't, though, because the Jenks Act provides that we're not required to give them any of this stuff until after the witness testifies on direct. I'm not talking about the Jenks Act. I'm talking about you argued that they had plenty of time. Yes. Your answer to that, I'm asking you about timeliness. You're saying we didn't have to give it to them. Well. So let's take it one at a time. As to the timeliness, there were two issues. Some of it was given to them immediately upon the completion of his direct examination. Why is that timely? That's timely because that's what the Jenks Act, when the Jenks Act says we're required to give it to them. And we're not required to give it to them any time sooner than that. And this trial was conducted three days a week, Tuesday, Wednesday, and Thursday. So everybody had from Friday through Monday to spend substantial amount of time reviewing materials. They were entitled to and did bring Verdi back for further testimony. And as this Court has held repeatedly, as long as the defendants get the material in a fashion that allows them to bring the witness back for further cross-examination, then they're not prejudiced. But once again. Were the defendants able to cross-examine Verdi about what he had told other suppliers of this precursor? I believe that there was some information about that, perhaps with respect to William Yunus. I haven't reviewed the evidence with that question in mind. But I can tell you. It's an important question, isn't it? Well, I don't know that it is, Your Honor, because. How could it not be? How could it not be? In the clear error review standard, you need to look at such things as whether the district judge carefully considered this and whether there was any prejudice to the defendants. And in looking at the prejudice to defendants, you look at the rest of the record. There was a huge amount of evidence against these witnesses. I'm going to put down my list because I took some notes during the argument. And I just want you to, if you know, was there any cross-examination of Verdi about him fooling other suppliers of precursors, lying to them, duping them, that sort of thing? I did not review the record for that. I don't know. The answer is you don't know. I don't know. Okay. Were they able to cross-examine him, for example, on the fact that he had a source within DEA? No. And what was the nature of that source? Well, that turned out not to be true. Did he brag about it? Yes. We don't know that he bragged about it to these defendants. Is that the redacted information we're talking about now? Yes. That's redacted information. That we have in sealed form at this point. And subsequent, subsequent investigation has revealed that not to be true. But, I mean, I don't have that in the record because there's no mechanism for me to put that subsequent information in the record. It seems to me that in this case where you have a, you know, this is not your standard crim law intent requirement statute. This is pretty close to a negligent standard, new or should have known. And you have these competing theories. As I read the record, the government's theory is these people that dealt with Verdi had to know what this stuff was being used for, the amounts, the method of payment, et cetera. Their defense is that this wasn't lineal. This wasn't Mr. and Mrs. Rosen dealing with one individual. This is David Verdi at the spoke of a great big hub of a wheel, and he's dealing with lots of people, and it may have been part of his method of operation to fool suppliers that this was okay, that there was nothing wrong with it. Were they able to cross-examine him about that? Well, something in your statement just now reminded me about evidence pertaining to Mr. Khalil. Mr. Khalil was a cooperating co-defendant who was also involved in this scheme. At one point, he testified about how he was duped by Verdi. And in addition to that, whether you use a wheel and spoke or a chain theory of conspiracy, Dan Rosen dealt with other people besides David Verdi. He had Ali Mafa. He had Mr. Khalil. He had Mr. Deeb, who were all independently customers of his, as well as customers of his in association with David Verdi at different times. Carragher against Stewart was on the books when you tried this case, wasn't it? Yes. Here's what, I think it was Judge Trott who wrote it, said that this kind of witness is by definition cut from untrustworthy cloth and must be managed and carefully watched by the government and the courts to prevent them from falsely accusing the innocent, from manufacturing evidence against those under suspicion of crime, and from lying under oath in the courtroom. Because the government decides whether and when to use such witnesses and what, if anything, to give them for their service, the government stands uniquely positioned to guard against perfidy. Accordingly, we expect prosecutors and investigators to take all reasonable measures to safeguard the system against treachery. The responsibility includes the duty, as required by Giglio, to turn over to the defense in discovery all material information casting a shadow on a government witness's credibility. And you're confident you did that in this case? Yes, Your Honor. And remember that David Verdi was not an informant. He was not somebody that the government wired up and sent into meetings with any of the defendants in this case. He was apprehended a year after he was indicted. Neither was Carragher. Well, I recognize that it's important for the government to disclose any deals. I mean, the way I read this, Carragher against Stewart, is that when you're dealing with a government cooperating witness, you have a higher burden of disclosure to prevent dishonesty, to prevent treachery, to prevent lying under oath. I understand that, Your Honor. And you're confident on this record you met that standard? Yes, Your Honor. And the reason that I'm confident is that the defendants were able to show that Verdi was a major player in the pseudoephedrine business. As shown on page 110 of our brief, he testified, and they were able to cross-examine him about his involvement with M&K, with Hammer, with Spectrum, with numerous other companies that sold pseudoephedrine besides Dan Rosen. In addition to that, we showed him to be, they showed him to be on cross-examination a money launderer of huge caliber, a manipulator, a liar, a fraud, a tax cheat, a convicted forger, a perjurer. He admitted conducting, committing perjury in his applications for false identifications to DMV. He, they were able to show on cross-examination that he had threatened violence and that he ran with violent people. They were able to show he was convicted of aiding and abetting the conspiracy to manufacture methamphetamine in the Central District. What about the allegation that he lied under oath when he said he didn't know how to make methamphetamine? When the government had debriefed him in advance of trial and he told them that he did. In later examination, he was shown to know about the product going to methamphetamine labs. Through the use of this material I just described? Yes. This material was introduced? Yes. And, in fact, he testified that he was supplying the product to Flaco and he named several other people whom he knew were going to use it to make methamphetamine. Your Honor, I see that I have a little bit of time left. On the reasonable cause to believe issue, I think that our brief is pretty thorough. The one thing is that in attempting to attack the statute on its face, the defendants must bring that issue before the court by way of an allegation that it is unconstitutional because it's vague. And this Court held in Easy Rider Freedom Fight that they couldn't do that. They couldn't make a facial challenge to it like that, absent First Amendment issues. Instead, they would only be able to bring it as an as-applied challenge. And we've addressed the as-applied challenge extensively in our brief. What do you think the mental state is that's required under the statute? I believe that it's knowing or having reasonable cause to believe. The government can proceed under either theory. Do you think it's negligence? Yes. So you think negligence suffices? I think negligence will suffice. Yes. And in this case, we argued. And that's the way you argued the case. No. No, Your Honor. We argued he knew, he knew, he knew, he knew, he knew, he knew. But even if he didn't know, he at least had reasonable cause to believe. Let me quote your argument. Finally, on reasonable cause to believe, again, only as to count one, this is less than direct knowledge. This isn't actual knowledge. Instead, it's knowledge of facts and circumstances that would cause a reasonable person, knowing the same things that were presented to the defendant, that they would conclude that the list one chemical would be used to manufacture. Right. That's your theory. That's right. And that is negligence language. That's correct. But we then went on from there to talk about all of the actual. No, I understand that you argued about action. Okay. I'm talking about the legal standard here. Yes. Because if you're telling the jury, this is what it takes to convict these people, and it doesn't matter if you then go on and say, here's a lot of actual knowledge stuff. You're talking about the legal standard under which they're going to make their judgment. And your position is it's negligence. Yes. Okay. But you may uphold it on the evidence in the record of actual knowledge because of the nature of the general verdict and your ability to uphold the conviction under any basis shown in the record. And on that last, let me segue into Dan Rosen's motion for a reduction based on ineffective assistance of co-defendant's counsel. I discovered in preparation for argument that I had failed to address their argument regarding sentencing disparity. And I confess I overlooked that, and I would have made time or room in my extensive brief for it had I realized that. But I would like to refer the Court to the government's argument on pages 77 through 86 of Defendant Rosen's supplemental submission, where the government addressed the reasons for the disparate treatment of Dan Rosen from all the other defendants, including Betty Rosen. For one major reason, he got a role enhancement for his leadership. In addition to that, his perjury was much more sophisticated than his wife's perjury. In addition to that, the government did argue the issue of sentencing disparity with respect to co-defendants, the Mansours, and that is contained in the record well, in the Court's file in Document 466. And the district judge did, in fact, say that the sentencing disparity issue should have been based on nationwide disparity, while this Court has indicated that under Kuhn the judge can consider disparity with co-defendants. But as I was saying, I believe that we've shown that the disparity with the co-defendant was justified. Thank you, Your Honor. Thank you for your argument, counsel. Rebuttal? Two minutes? I didn't fix that. I'd be happy to take the 13 minutes. I think we're almost there. There we go. Thank you, Your Honor. I do want to point out that in this case, although the government technically did not need to deliver Jenks material until after the verdict was testified, the fact of the matter is that in this case the government delivered Jenks. What it told the defense was it's Jenks material six weeks before trial. For the very reasons that you, Your Honor, pointed out. And it was only during trial that additional material began to surface and the – it was very difficult to try to catch up with it. How does Judge Burrell handle Jenks Brady? What's his practice? Well, I'm not familiar. Does he require it to be produced in advance of trial? I don't know. I don't practice in his court. I usually practice in the Fresno trial court. And so I'm not familiar with his practice. I do know that in this case he did not require of the government the showing that he had to require in order to make a determination that there would be nondisclosure under Brady or under Jenks. He just simply had no information before him. The government has said, well, he had enough because there was information about ongoing investigations in the materials he was given. However, and I'm assuming that he read them, although it would be quite a feat given the little bit of time he had and the voluminous material. But assuming that he did, in fact, read them, the problem becomes that he had nothing in the materials that told him if these investigations had concluded already, who it was that would be protected by not disclosing them, what the purpose was, where they were headed, when they were supposed to conclude. He knew nothing that would enable him to do that weighing and balancing he was required to do and failed to do before he decided not to allow disclosure of these materials. Finally, I hope that I have finally understood the Court's question about if Verdi's such a big guy, aren't our guys worse. Our point is Verdi was too sophisticated to let that information be known to any of his tools in this process. And so I hope that addresses the Court's issue. I take your point. The bottom line is our clients were, it wasn't a question of did they have enough impeachment. There was significant impeachment. We don't argue with that. We think there should have been more. But they were deprived of corroboration for their sole defense. And there was no justification for it. There was no overweening governmental interest. And certainly Judge Barrell didn't have any information to that effect. Thank you. Roberts. Thank you for your argument. Thank all counsel for their arguments. We appreciate the defense cooperating on their time. And the case just argued will be submitted for decision. The Court's going to stand in recess for about ten minutes. If counsel on the San Remo case can come up and get ready, we'll come back out and hear that case last. We'll stand in recess.
judges: Fernandez, Hawkins, Thomas